2

United States District Court
Southern District of Texas
FILED

JUN 24 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Respondent | ) | |
| | ) | Civil No.: B-02.131 |
| vs. | ) | Crim. Docket No.: 1:00CR00139-001 |
| | ) | |
| | ) | |
| JOEL BENAVIDEZ DIAZ | ) | |
| Petitioner/Movant | ) | |

MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
MOTION TO VACATE, SET ASIDE, OR CORRECT
SENTENCE PURSUANT TO 28 U.S.C.A.§ 2255

TO THE HONORABLE COURT

   COMES NOW, the Petitioner, Joel Benavidez Diaz, pro se in the above-cited and numbered Memorandum of law in Support of his Motion to Vacate, Set Aside, or Correct Sentence Pursuant to **28 U.S.C.A. § 2255**. Petitioner hereby incorporates this Memorandum of law as part of his Motion by reference herein.

   Petitioner is not trained in the legal art of drafting and preparation of legal documents, so he asks the court to apply a "liberal construction" to his pleadings.

   See **Haines v Kerner**, 404 U.S. 519, 529 (1972).

### JURISDICTION

   As the sentencing court, this court has jurisdiction of this motion presented under **28 U.S.C.A. 2255**.

### STATEMENT OF THE CASE

   The Presentence Investigative Report, (PSIR) makes the following account of the issues in this case:

### The Offense Conduct

According to reports obtained from the Federal Bureau of Investi-

gations (**FBI**) and the United States Customs Service (Customs), this case originated of February 18, 1999.

On this date, **FBI** agents received information from a confidential informant (hereafter referred to as "source") concerning a narcotics transaction. According to the source, on February 11, 1999, he met with **Joel Benavidez** Diaz (hereafter referred to as **Diaz**) at the residence of Robert Benavidez (hereafter referred to as Benavidez). **Diaz** provided the source sample to a potential buyer. **Diaz** further advised the source he could provide the buyer with five (5) kilograms of cocaine at a time. The cost of the cocaine would be $13,500.00 per kilogram but would reduce the price if multiple kilograms were purchased. The source witnessed **Diaz** and Benavidez break one kilogram of cocaine into one (1) ounce quantities. After breaking down the cocaine, **Diaz** placed one-half ($\frac{1}{2}$) of the narcotics and a .357 pistol into the trunk of his vehicle. After the meeting, FBI agents obtained the sample provided to the source by **Diaz** and field tested the substance. Two (2) separate tests rendered negative results for the presence of cocaine.

On April 27, 1999, a meeting occurred between the source,**Diaz** and Benavidez outside the Sportsman's Bar in downtown Brownsville, Texas. Upon arriving, **Diaz** was driving a silver club cab Chevrolet truck. The source got into the truck. **Diaz,** Benavidez and the source drove down 10th Street and made a right turn on Levee Street. **Diaz** parked, pulled a bag of cocaine (one ounce) from under his leg and held it up for the source to see. The source then handed Benavidez $650.00 which had been provided by the FBI for the purpose of purchasing narcotics. **Diaz** counted the money and gave Benavidez $150.00,

2

his share of the sale. The substance purchased was tested by FBI agents and the results were positive for cocaine. The net weight of the cocaine was 28.35 grams.

On May 14, 1999, the source contacted Benavidez at the Sportsman's Bar in Brownsville for the purpose of continuing to negotiate for the purchase of more cocaine. These subsequent negotiations also included **Diaz**. Upon arriving at the bar, Benavidez informed the source **Diaz** was on his way. Benavidez walked out of the bar and asked the source for his share of the money for the sale. The source gave Benavidez $300.00 which was provided by the FBI for the transaction. Benavidez in turn gave the source his share of $150.00 A short time later, **Diaz** arrived at the bar driving the same silver Chevrolet truck and both Benavidez and the source got into the truck. **Diaz** drove around downtown Brownsville while the sale of four (4) ounces of cocaine took place. The source paid **Diaz** $2,000.00 which was provided by the FBI for the transaction. The source was then dropped off in front of the Sportsman's Bar. The substance was tested by the FBI and the results were positive for cocaine. The net weight of the cocaine was 113.4 grams.

From May 1999, through February 2000, negotiations continued between the source, various undercover agents, **Diaz** and Benavidez for the purchase of larger quantities of cocaine. The negotiations were subsequent to the cocaine purchase of May 14, 1999, and were in the form of physical meetings and telephone conversations.

On February 2, 2000, an undercover agent made contact with **Diaz**. During this recorded conversation, **Diaz** informed the undercover agent he had the cocaine and the supplier wanted the undercover agent to pick up the cocaine at a location near the Southmost

area in Brownsville. According to **Diaz** the supplier could also
supply marihuana. During the conversation, **Diaz** initiated a
three-way call between himself, the undercover agent and the
supplier who was later indentified by FBI agents as Martin Garza.
During this call, Garza informed the undercover agent the people
he is working with had dealt with **Diaz** prior to this occasion.
**Diaz** then asked Garza if the cocaine could be delivered to the
undercover agent rather than going into the Southmost area. **Diaz**
further requested Garza to ask an individual only known as
"Chaparro" if the transaction can be consummated in this fashion.
**Diaz** then suggested the transaction take place at "Juana's (Garza's
sister) house.

On February 8, 2000, at approximately 3:00 p.m., the source,
accompanied by an undercover agent, met with **Diaz** and Benavidez
at the parking lot of the Shoney's Restaurant located at the
intersection of U.S. Highway 77 and FM 802 in Brownsville. The
purpose of this meeting was to negotiate the purchase of additional
larger quantities of cocaine from **Diaz** and Benavidez. During this
meeting, physical and video surveillance was initiated by the
Cameron County Drug Task Force and FBI. **Diaz** and Benavidez arrived
in a black Chevrolet truck and contacted the source and the under-
cover agent outside the restaurant. During this meeting, **Diaz**
had a conversation on his cellular telephone with Garza. After
several minutes, all parties returned to their respective vehicles
and departed. **Diaz** informed the undercover agent he was going to
show him and the source a house frequently used for drop offs.
**Diaz** showed the source and the undercover agent a house on San Juan

Street in Brownsville. **Diaz** also advised the source and the under-cover agent two (2) other houses were used. One was the house of Martin Garza's brother and the other a ranch house outside of Brownsville.

On February 16, 2000, an undercover agent dropped off a van at the Whataburger Restaurant on International Boulevard in Brownsville to be used as a load vehicle for the purchase of two (2) kilograms of cocaine and two hundred (200) pounds of marihuana. At approximately 2:25 p.m., **Diaz** and Benavidez arrived in a black 1984 Chevrolet truck. After a short conversation with the under-cover agent, **Diaz** and Benavidez departed in the van. Surveillance teams followed **Diaz** to his residence at 3374 Court Street in Brownsville. The van was then driven to a residence at 11001 Southmost Road in Brownsville. The residence was described by agents as a white mobile home on a large lot with a shed in the back. The mailbox for this property had the name "Garza" imprinted on the outside. A check with the Texas Department of Motor Vehicles revealed Deyanira Garza, Martin Garza's wife, possessed a Texas driver's license with this address. This address is Martin Garza's residence. After several minutes, the van departed and was driven to another residence at 6264 Monte Bonito in Brownsville. **Diaz** and Benavidez subsequently drove the van back to the 11001 Southmost Road residence and then to a residence at 11039 Southmost Road. A check identified the owner of this residence as Salvador Garza. A check of Salvador Garza listed his mailing address as 11114 Arkansas Avenue in Brownsville. A further check with the Texas Department of Motor Vehicles revealed Martin Garza was a tenant

of 11114 Arkansas Avenue. The van was returned to the Whataburger Restaurant without being loaded with narcotics.

On February 18, 2000, the source met with **Diaz** and Benavidez at the Sportsman's Club in Brownsville. **Diaz** informed the source the transaction failed because he had seen several vehicles in the neighborhood that didn't belong there. He added he noticed a vehicle had followed them from the parking lot of the restaurant.

For the remainder of February 2000, through February 2001, negotiations continued for the purchase of cocaine and marihuana from **Diaz** and Benavidez. These negotiations were in the form of physical meetings and telephone conversations.

On May 11, 2000, the source, accompanied by two (2) undercover agents, met with **Diaz** at the Motel 6 (room 250) in Brownsville, Texas. During the course of this meeting, **Diaz** received a phone call from someone who the source believed to be Martin Garza. **Diaz** informed the caller of his meeting and at the conclusion of his telephone conversation, **Diaz** informed the source, that should a cocaine transaction occur, it would have to be in the parking lot of the hotel. He further advised in order for marihuana to be purchased, the source would have to provide a vehicle. The vehicle would be taken to a stash house where it would be loaded with the marihuana.

On January 9, 2001, the source contacted **Diaz** in an attempt to purchase narcotics. **Diaz** arranged for the source and an under-cover agent to meet with him at the Burger King on U.S. Highway 77 in Brownsville. Upon arriving at Burger King, **Diaz** was driving a maroon four (4) door sedan. **Diaz** made contact with the undercover

agent and asked the whereabouts of the source. The undercover
agent informed DIaz the source had gone into Burger King and
would be right back. Diaz began to open the rear door of his
vehicle in what appeared to be his retrieval of cocaine.
However, Diaz closed the door and informed the undercover agent
he would wait for the source. Upon exiting Burger King, the source
made contact with Diaz . Diaz informed the source he only wanted
to deal with him. At that point, the source left with Diaz and
was later dropped off near the Coastal Mart on FM 802 in Brown-
sville. The transaction was never consummated. Diaz later informed
the source he got nervous and sent the "stuff" (cocaine) back.

On February 14, 2001, surveillance teams observed Diaz
and an individual known as "Maldonado" talking with an unidentified
person in front of a business known as Biper Net located at 3019
Southmost Road in Brownsville. Biper Net is a communications busi-
ness owned by Diaz. A short time later, Diaz and Maldonado departed
in a white Saturn. Diaz and and Maldonado drove to Home Depot
located on 14th Street in Brownsville. Diaz and Maldonado were
seen purchasing a white bucket and several unknown items. The two
were then followed to the Wal-Mart Store located on Boca Chica
Boulevard. They were observed walking out a short time later
after purchasing several items, one of which was a blue plastic
container. Diaz and Maldonado then drove to the parking lot shared
by Office Depot, Target and Michael's Craft Store on Boca Chica
Boulevard. The two subjects were seen walking into Office Depot.
They exited the store carrying a plastic bag with unknown items,
a clear plastic bag containing white packing foam and two (2)

carboard boxes. Maldonado was seen on a cellular phone call while
**Diaz** entered Michael's Craft Store and returned a short while
later with a plastic bag containing unknown items. Both Maldonado
and **Diaz** were seen making cellular phone calls. They both later
entered Office Depot and exited with a third cardboard box.

Diaz and Maldonado then drove to 11001 Southmost Road in
Brownsville, Texas. The owner of the residence was previously
identified as Martin Garza. **Diaz** and Maldonado were observed to
drive directly to the rear of the property to a storage building.
The trunk of the vehicle was opened and the door to the storage
was opened by an unknown third person. Several items were placed
in the trunk of the vehicle; however surveillance teams could not
identify the items due to the distance. Upon leaving the residence
on Southmost Road, **Diaz** and Maldonado drove to **Diaz** residence.
Maldonado and **Diaz** were oberved unloading several items from the
trunk of the vehicle and placing them in the garage of the resi-
dence. Maldonado and **Diaz** again left the residence and drove to
the Magic Time U-haul on Boca Chica Boulevard in Brownsville and
purchased packing tape. They made a second stop at the Office
Depot also on Boca Chica Boulevard and purchased several unknown
items.

On February 15, 2001, FBI and Customs Agents approached **Diaz's**
residence. Written consent was obtained by **Diaz's** wife to search
the residence. A search revealed two (2) scales, two (2) food
saver plastic heat sealers, several plastic bags, plastic wrap
and packing foam. In the master bedroom of the residence. agents
found a blue plastic container containing twenty (20) pounds of

marihuana. A sealed cardboard box was found and agents utilized
a narcotics detecting canine. The canine responded in a positive
manner for the presence of narcotics. Upon obtaining a search
warrant, agents found sixteen (16) additional pounds of marihuana.
The total weight of marihuana found was thirty-six (36) pounds.

Agents proceeded to **Diaz's** business where he was subsequently
arrested for his participation in the instant offenses of convic-
tion. Upon arresting **Diaz,** he was found to be in possession of
a 9mm pistol and $1,706.76 cash. These items were seized. Further
investigation revealed **Diaz** was a convicted felon. A record check
revealed on September 3, 1999, Diaz was convicted for possession
of a controlled substance, Cause No. 99-CR-714-B, in Cameron
County, Texas. He was sentenced to two (2) years confinement sus-
pended for five (5) years probation.

On this same date, agents obtained written consent to search
Martin Garza's residence at 11001 Southmost Road in Brownsville.
A search of the storage building in the rear of his property
resulted in the discovery of thirty (30) grams of marihuana. Garza
was subsequently arrested.

**Diaz** and Benavidez are accountable for the five (5) ounces
of cocaine which were sold to the source on April 27, 1999, and
May 14, 1999, two (2) kilograms of cocaine and two-hundred (200)
pounds of marihuana which were to be delivered on February 16,
2000, and the thirty-six (36) pounds of marihuana which were found
in **Diaz's** residence during the search of his residence of February
15, 2001.

Garza is accountable for the two (2) kilograms of cocaine

and two-hundred (200) pounds of marihuana which were to be
delivered on February 16, 2000, and thirty (30) grams of marihuana
found at his residence on February 15, 2001.

An analysis of the instant offense revealed Diaz, Benavidez
and Garza share roughly equal culpability in the commission of
the instant offense. All three (3) defendants negotiated with the
source and the undercover agents and all were aware of the scope
of the offense. There is no evidence at this time to suggest either
Diaz, Benavidez and Garza recruited each other to participate in
the instant offense, none were to receive larger shares of the
fruit of the crime, none appear to have had more decision making
authority than the others and all being assessed as to all three
(3) defendants.

Petitioner was sentenced on July 2, 2001. He did not file
a direct appeal.

Petitioner now timely files this motion seeking relief under
28 U.S.C.A. § 2255.

## LEGAL ARGUMENT

### DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE ENHANCEMENT UNDER U.S.S.G. § 2D1.1 (b)(1) FELL BELOW THE OBJECTIVE STANDARD OF REASONABLENESS

Petitioner's defense counsel provided ineffective assistance
of counsel by failing to object to the enhancement of his sentence
under § 2D1.1 (b)(1). To establish ineffective assistance, Peti-
tioner must show the court that his attorney's represtation fell
below an objective standard of reasonableness and that there is
a reasonable probability that the results of the proceedings
would have been different without the attorney's errors.

Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052,
2064-65, 80 L.Ed.2d 674 (1984).

Petitioner respectfully asks the court to first consider
the correctness of the court's ruling on the enhancement. The
court accepted in its totality, the PSIR, and adopted it as its
finding.

"Agents proceeded to Diaz's business where he was subsequently
arrested for his participation in the instant offenses of convic-
tion. Upon arresting Diaz, he was found to be in possession of
a 9mm pistol and $1,706.76 cash. These items were seized. Further
investigation revealed Diaz was a convicted felon. A record check
revealed on September 3, 1999, Diaz was convicted for a possession
of a controlled substance, Cause No. 99-CR-714-B, in Cameron
County, Texas. He was sentenced to two (2) years confineminement
suspended for five (5) years probation." (PSIR at pg. 9, para. 25).

"Specific offense characteristic: At the time of the defendant's
arrest, he was found to have in his possession a 9mm pistol.
On September 3, 1999, Diaz was convicted for possession of a con-
trolled substance, Cause Mo. 99-CR-714-B, in Cameron County, Texas.
Pursuant to U.S.S.G. § 2D1.1 (b)(1), the offense is increased by
two (2) levels."

While U.S.S.G. § 2D1.1 (b)(1) provides enhancement for
possession of a firearm, all the available precedent from the 5th
Circuit Court of Appeals indicates that the enhancement is not
to be applied without drugs being found with the weapon or evidence
presented that the location of the weapon was used in connection
with drug activities.

Thus, it is clear under U.S.S.G. § 2D1.1 (b)(1) that the Petitioner's sentence should not have been enhanced without a connection being made between the weapon and the drug activities - so the question presented is whether Petitioner's defense counsel rendered ineffective assistance by failing to object to the enhancement, in light of previous 5th Circuit precedent that Petitioner should not have been enhanced without the government's presentation of evidence that would have established a link between the weapon and the illicit activities. See for example: **United States v. Vasquez,** 161 F.3d 909, 912 (5th Cir. 1998); **United States v. Eastland,** 989 F.2d 760, 770 (5th Cir. 1993); **United States v. Brown,** 217 F.3d 247, 261 (5th Cir. 2000); **United States v. Flocas,** 99 F.3d 177, 178-79 (5th Cir. 1996); **United States v. Myers,** 150 F.3d 459, 465 (5th Cir. 1998); **United States v. Siebe,** 58 F.3d 161 (5th Cir. 1995).

To establish an ineffective assistance of counsel claim, a defendant must first show that counsel's failure to raise an issue fell "below an objective standard of reasonableness." **United States v. Phillips,** 210 F.3d 345, 348 (5th Cir. 2000). In this case Petitioner's counsel made no objection to the enhancement of his sentence, in the face of a number of cases from the 5th Circuit Court of Appeals holding the enhancement to be improper under the factual circumstances. Counsel's failure to object falls below this objective standard of reasonableness, and Diaz has therefore satisfied the first prong of his ineffective assistance of counsel claim.

To show prejudice from this deficient performance, Diaz must also show "a reasonable probability that but for trial counsel's errors the Petitioner's non-capital sentence would have been

12

significantly less harsh." **Spriggs v. Collins**, 993 F.2d 85, 88
(5th Cir. 1993). The prejudice prong is satisfied however "when
a deficiency by counsel resulted in a specific demonstrable
enhancement in sentencing such as an automatic increase for a
'career' offender or an enhancement for use of a handgun during
a felony - which would not have occurred but for counsel's error."
**United States v. Phillips**, 210 F.3d at 351; **Spriggs**, 993 F.2d at
88 n.4.

Without the improper enhancement, Petitioner's offense level
would have been reduced from 27 to 25 and his guideline range
from 78 - 97 months to 63 - 78 months. Diaz was sentenced to 87
months, 9 months longer than the maximum permissible guideline
sentence had the sentencing guidelines been applied properly.
Therefore the alleged error here did result in a specific, demon-
strable increase in sentencing, and Diaz suffered prejudice be-
cause of it.

### PETITIONER'S ENHANCEMENT FOR POSSESSION OF A FIREARM UNDER § 2D1.1 (b)(1) WAS ERRONEOUS

Despite the fact that Petitioner pleaded guilty to the base
offense of possession with intent to distribute a quantity exce-
ding 500 grams of cocaine, a schedule II controlled substance and
aquantity exceeding 100 kilograms of marihuana, (a schedule I
controlled stbstance (in violation of 21 U.S.C. §§ 846, 841 (a)
(1) and 841 (b)(1)(B), the district court erroneously enhanced
his sentence based on possession of a firearm under U.S.S.G. §
2D1.1 (b)(1). This section of the Sentencing Guidelines dealing
specifically with Unlawful Manufacturing Importing, Exporting,

trafficking or possession; continuing Criminal Enterprise states: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels.

Firstly, the weapon seized had no connection to the drug offenses.

Secondly the weapon seized was a weapon legally purchased and owned by the Petitioner's wife.

When Petitioner was arrested at his place of business on Southmost Road, the arresting officers had already conducted a search at his house on Court Street, at least a quarter-mile away.

According to the Presentence Investigation Report (PSIR), a total of 36 pounds of marijuana was found at his house. No weapon was found there. After finding the drugs, officers proceeded to Petitioner's place of business where for the last year he sold cellular telephones and beepers. Upon their arrival at the business, officers immediately put Petitioner under arrest. After he was handcuffed, Petitioner was asked if there was a weapon on the premises.

Petitioner responded affirmatively, explaining that at the desk where his wife kept cash and managed the accounts, there was a pistol inside the money bag that she used to take the business' daily proceeds to the bank.

The moneybag containing over one thousand dollars and the pistol was seized.

Again no illicit drugs were found at the premises where Petitioner had been operating his business and at which he was arrested. There was no evidence linking the place of business, or the

14

moneybag used by Petitioner's wife, to the drug traffickng.
Without such a nexus, the enhancement was unwarranted.

As indicated previously, the sentencing guidelines provide
that the defendant's sentence should be increased by two levels
whenever, in a crime involving the manufacture, import, export,
trafficking, or possession of drugs, the defendant possessed a
dangerous weapon. See 2D1.1 (b)(1); **United States v. Gaytan**,
74 F.3d 545, 559 (5th Cir. 1996). "The government has the burden
of proof under § 2D1.1 of showing by a preponderance of the
evidence 'that a temporal and spatial relationship existed
between the weapon, the drug traffickng activity, and the
defendant,'" **United States v. Vasquez**, 161 F.3d 909, 912 (5th Cir.
1998) (quoting **United States v. Eastland**, 999 F2d 760, 770 (5th
Cir. 1993)). Under this standard the government must show that
"the weapon was found in the same location where drugs or drug
paraphernalia are stored or where part of the transaction occurred."
**Eastland**, 989 F.2d at 770 (internal quotation marks and citations
omitted). This is a facural finding subject to review for clear
error. **United States v. Jacquinot**, 258 F.3d 423, 430 (5th Cir.
2001).

Petitioner repectfully alleges that in cases dealing witha
an enhancement for possession of a firearm there has been evidence
affirmatively linking the drug trafficking activity to the  weapon
or the place where the weapon was found. In **United States v. Brown**,
the court of appeals for the Fifth Circuit upheld the two-level
enhancement pursuant to § 2D1.1 (b)(1) where police found a shot-
gun in the trunk of the defendant's car during the course of their

investigation. 217 F.3d 247,261 (5th Cir. 2000), **remanded on other grounds, Randle v. United States**, 531 U.S. 1136, 121 S.Ct. 1072, 148 L.Ed.2d 950 (2000). Witnesses provided the necessary link between the gun and the drug trafficking by testifying that the defendant used the vehicle to transport crack cocaine. Similarly in Vasquez-Zamora, guns kept at the defendant's place of business were used to enhance the sentence because the district court found that the defendant used the business as a location to store drugs and the proceeds of drug sales. **Vasquez**, 161 F.3d at 912; **United States v. Flucas**, 99 F.3d 177, 178-79 (5th Cir. 1996) (enhancement applied where gun and cocaine both found under defendant's car seat); **United States v. Myers**, 150 F.3d 459, 465 (5th Cir. 1998) (gun found in apartment where transactions related to drug con-spiracy took place).

In contrast to the facts of **Brown** and **Vasquez-Zamora** no mariuana, cocaine, or drug paraphernalia was found at Petitioner's place of business when and where the firearm was seized, and there in nothing in the record showing that **Diaz** used his place of busi-ness to conduct any activities associated with the conspiracy. The government presented no evidence that would support this enhance-ment - that being a claim of illicit activity and/or the discovery of drugs or drug paraphernalia at the place of business.

Petitioner alleges that there are "no cases in which the enhancement was applied without drugs being found with the ewapon or evidence presented that the location of the ewapon was used in connection with drug activities." See, **United States v. Cooper**, 274 F.3d 230, 246 (5th Cir. 2001).

As the 5th Circuit state there:

"As a practical matter the government's argument would result in an enhancement any time a drug offender is found with a gun regardless of whether drugs are also found or otherwise connected to the gun's location as long as the government alleges that the defendant is involved in an ongoing conspiracy. Of course, such a holding would relieve the government of its burden of proving that temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." (**U.S. v. Cooper, at 246**).

The 5th Circuit Court of Appeals decision in **United States v. Siebe**, 58 F.3d 161 (5th Cir. 1995), is instructive on the issue discussed here. In that case, the appellant asserted that the district court erred in assessing two points under § 2D1.1 (b)(1) based solely on the presumption that he possessed a firearm because he was a police officer. The 5th Circuit explained tha absent the presumption there was no evidence that Siebe possessed a fire-arm during the commission of the offense. The court stated: "while we acknowledged that the FBI had discovered 90 guns in Siebe's residence, there was no evidence of drug trafficking activities at the residence. As such, we concluded that the government had not abondoned its burden of proving the requisited connection between the firearm and the drug trafficking. Thus, we remanded for resen-tencing without the two-point enhancement."

## CONCLUSION

Wherefore, all premisss considered, Petitioner prays that the court grants him the relief sought by vacating his sentence and resentencing him without the improper two-point enhancement.

Joel Benavidez Diaz
Reg. No 94714-079
F.C.I. Bastrop
P.O. BOX 1010
Bastrop, TX 78602-1010

### CERTIFICATE OF SERVICE

I certify that on this day, _____ of June, 2002, a true and correct copy of the foregoing Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255, was sent via United States Mail to :

Assistance U.S. Attorney Jody Young
600 E. Harrison Street, # 201
Brownsville, Texas 78520-7155

Joel Benavidez Diaz
Reg. No. 94714-079
F.C.I. Bastrop
P.O. BOX 1010
Bastrop, TX 78602-1010